This case has a lot of supposed evidence against this client, but there is no evidence against the client. I'd like to start because in the storage room that was searched that was part of his father's residence, not his residence, the court relied on the things that were found in there, the food saver device, the food saver bags, and the insulation. And if you look at the actual storage room picture, and that's records 385, it looks like a storage room. So if he packaged these drugs in that room, which he would have had to if he used the bags and the food saver device and the insulation, he would have had to have scales there to weigh it, some method to take out the drugs that he brought in, to put on the scale, to put in those bags, and to heat seal it. And to cut that insulation, he would have to lay that out and have, because it was six sides in that box, all four, the top and the bottom, some sort of a square and a cutting knife. What is this going to, if I may? Pardon? What is this? Are you arguing substantial evidence now, or what are you arguing? What legal argument is this addressed to? I am arguing there was insufficient evidence to prove, and there's no evidence that he was even in that storage room. They didn't find anything that belonged to him. They only found his father's badge, which I thought it was him, and they did surveillance on his father, thinking it was him. They didn't do any fingerprints at all on anything that was found in that storage room. But we don't even know if that food saver device, it looks very old, the box of packages look old. We don't even know if it even worked. There was no evidence to show that. And then on top of that, the government said that, in the search warrants, said that that later on that he knew there was another residence, that that wasn't his residence. He lived someplace else. And if you look at Exhibit 15, the safe travel records, and that's ER 380, it actually gives an address for him which isn't his father's. It's 1225 West 36th Street, LA, and another zip code. And the shipping label that was supposedly sent by him, there's no evidence he sent that box. They didn't take any surveillance. They didn't go out and find out if there were any surveillance photos. There were no fingerprints taken off of anything. And the shipping label was that of another zip code that wasn't even close to where either his father was or where he supposedly lived. But even if we were to completely disregard the evidence from that room, there's also the recorded messages discussing, or the recorded calls in which he's discussing the package, the text messages with the tracking number for the package. So, I mean, we have to look at all the evidence in light most favorable to the government, right? Why isn't that enough for the jury to have convicted? Well, because the judge stated that those packing materials were the most significant piece of evidence that tied the defendant to the drugs. Those packing materials that were found in a storage room with no evidence to show that he actually was in there, used it, or those were the materials that were actually inside that box. And he said it's the most damning evidence. And as far as those text messages and the phone calls, if you look at the expert that did the analysis of, Padzinski, I think his name was, he said that, yes, those came from that phone, but there was no way to tell who that person was either sending those messages or speaking on that phone. They couldn't identify that person. And there was no expert, actually, to analyze those. I thought they did identify them with the voice recognition testimony. Pardon? I thought there was testimony as to his voice to identify him. That was Agent Gray, but he did not have that much experience. He said that he was in hearing distance when he was arrested. He wasn't the arresting officers. He wasn't the one interviewing him. And how do we know how far away he was? Did he have any actual conversation with him? There's no evidence that he actually had a speaking conversation with Mr. Jones at all in order to be able to identify his voice. He was told by Saxton, as soon as Saxton was arrested and he cooperated, he says, well, my source of supply is Mr. Jones. But there was no other evidence to prove that. And then another thing on the conspiracy charge. The government stated that the search of Saxton's residences, two of them, was evidence of conspiracy in charge one. However, Saxton was never charged with conspiracy. He was only charged with the counts in the information at first after he was arrested, then in the indictment later on. He was only charged with the counts for possession and selling, and the guns that were found, and the ammunition that was found. He was not charged with conspiracy. Conspiracy takes at least two people. And so if they're accusing Mr. Jones of being a co-conspirator with Saxton, then why wasn't he charged with conspiracy? And there's really no evidence of an agreement either between Saxton and Mr. Jones in order to resell or whatever Saxton was doing by selling the drugs. There was no agreement that he was part of that or knew anything about it. If Jones was guilty of selling the drugs, then it really is not there, beyond a reasonable doubt, to prove that. Then there had to be some agreement for this conspiracy charge. But if Saxton was in charge, I don't see how that can even stand up on that. You want to discuss the firearms? Pardon? You want to discuss the firearms issue? On Saxton? No. The firearms enhancement. Oh, the firearms enhancement. Okay, the firearms were found in that storage room in a backpack, but no fingerprints were taken on the firearms at all. And so how are they going to prove it? The father, Mr. James Jones, who owned that and was resident of that property, he had numerous tenants in his home. And if you look at the storage room, it's full of all kinds of stuff. And if you find a backpack, and in fact the government said, well, it's because it said Clippers on the backpack, and of course Mr. Jones is a basketball fan, then that's over the top as far as evidence is concerned. But people in L.A., people in L.A. are Clippers fans if they're fans of basketball. And so that had no, okay, I lived in Colorado and everybody, I mean people in Colorado, we were Broncos fans, okay? Same with L.A., they have their fans. But just because it was a Clippers backpack, how can that be evidence that it belonged to him? And how can those guns say that he had possession of those guns when there was no evidence he had possession? There was no evidence he was in there, in that storage room. Also, when he was arrested, there was nothing found in his car. There were no drug paraphernalia, no drugs, no guns, nothing. There was nothing. So they had no evidence that he had any possession of drugs or any firearms or any ammunition. There was no evidence. And I don't see how you can tie something found in a storage room that belonged to somebody else, he did not reside there, even though the PSR stated that he occupied that storage room. Well, there's no way anybody could have occupied that storage room if you take a good look at that picture of all the stuff that's in there. And by California law, he can't occupy that. There was no bathroom, there's no place to sleep, there's no place to do anything. And even during the evidentiary hearing, it was testified that they didn't even test like the refrigerator was in there, it wasn't working. So there's no evidence here that can prove that he was in there. The same with the obstruction of justice, that he was fleeing from law enforcement. He didn't know there was law enforcement. They were on unmarked cars, they had no sirens, they had no lights. And when Gray said that they stopped on the freeway, well you don't stop on an L.A. freeway during, this was approximately 8 a.m. because the search was at 6 a.m., they said it was two hours later approximately. Anybody that's been on an L.A. freeway at that time of morning, traffic is moving. If you stop, then it's going to create an accident. Also Gray said that they were in the far left-hand lane and he was in the far right-hand lane. Left lane on these freeways is a carpool lane and they move quickly. And in the far right, that's generally a lane where you're going to take off and take an exit on. And you could not be going 120 miles an hour on those freeways because it would just be impossible because you're stuck in traffic. Is your point that they were lying? Pardon? That he was going 120 miles an hour, is that right? Gray testified he was going 120 miles an hour. You can't go 120 miles an hour on a freeway at 8 a.m. in the morning with all the freeway traffic. You barely, sometimes you're not even going the speed limit. It depends, you know, on which freeway you're on. The point is that it shouldn't have been believed? I'm stating that there was contradictions in Gray's testimony in the grand jury transcript and in the trial testimony as to exactly what happened and that's quoted in the briefs. But also, there was no evidence that he knew that law enforcement was following him. And when the judge said, because the phones died... He was going 120 miles an hour. Pardon? If he was going 120 miles an hour, that's some evidence that he thought law enforcement was following him. No. It would be unlikely that he would be going 120 miles an hour if he wasn't fleeing from law enforcement. I don't see how he could on an L.A. freeway at that time of morning. It would just be impossible to go that fast. And also, when the judge said that because the phone went dead, they couldn't track his pinging anymore, that was absolute proof that he knew law enforcement was following him. But that's not true because even in the pinging, it stated that there's places where the pinging can't happen. There are places that can't hit. And also, it's only every 15 minutes approximately. And so, how long was this taking place? And then, if he had turned off his phone, if he's going fast and getting off, how's he going to reach over and turn off his phone? Most likely, it died or the pinging couldn't take effect. So that's not something that the judge said, that's the definite evidence that he knew that he was being followed by law enforcement. That can't be the definite evidence because it's just not there. Did you want to reserve some of your time? Pardon? Did you want to reserve some of your time? Yes, I reserved two minutes, Your Honor. Okay, so then one minute from now, you'll need to stop. Okay. On the other thing that, on the transcripts, that really bothered me because the initials were on the transcripts. They were given to the jurors to read. And the defense attorney tried to object, and he wasn't as specific as he could have been, but when he tried to, then the judge cut him off and said, overruled. And then the judge did not give the admonition that you're not to consider the transcripts as evidence, et cetera, et cetera. He only did that during the jury instructions at the very end. He did not do it every time those to decide who was the speakers because it was written on every line of every transcript that was submitted. We've already talked about the identification. Now you are down to two minutes, so if you want to... Okay, Your Honor. Thank you. We'll hear from the government now. May it please the Court. Michael Albanese on behalf of the United States. The issues on appeal in this case fall roughly into three buckets. There's the sufficiency of the evidence issues, there's two objections to evidence admitted at trial, and then there's the two objections to sentencing enhancements. So I think it makes sense to approach them in that group. As to the challenge of the sufficiency of the evidence with regard to the conspiracy conviction, there was ample evidence of a agreement between Felix Daxson and Jamil Jones. And you have for that purpose not only the recorded calls between Felix Daxson and Jones in which Jones already admits that he has a package on the way arriving that day containing a specific amount of heroin and methamphetamine, and then a parcel arrives with quantities that match those descriptions precisely. Essentially, the sufficiency of the evidence question turns on the evidentiary question, right? I mean, if the transcripts were properly admitted, there's no doubt that there was sufficient evidence. Is that right? I would say... I wouldn't say it turns on it, but I would agree that there's no doubt that there's sufficient evidence in either instance. But I would be happy to address the transcripts. Without the transcripts, what was the sufficient evidence? So with the calls, you mean? If there were no transcripts, but there was... No, the calls. I mean the calls. So the calls are certainly the key evidence. Right. Okay. That was my point. So, all right. Go ahead. So therefore, it seems that there's sufficient... With the calls and the recordings of the calls, there's no doubt that there's sufficient evidence. That's correct, Your Honor. And there's no objection as to the admission of the calls themselves. The objection is to the format of the listening. I thought there was an objection on the ground, or at least there was an objection that there was no proof that that was him on the phone call. That the evidence that it was him on the phone call was insufficient. That's correct. That's an argument that's made on appeal. But I would submit that it's completely rejected by the evidence. Beyond the voice identification evidence, the evidence of those calls were on the phone that was recovered outside of Jamil Jones' motel room. So if it were somebody else, that person would've had to follow him into the desert and thrown that phone outside the precise motel room that he was hiding in. In addition, on that... Also, the phone that Thaxton said was his phone. Right. Well, there was evidence from two phones introduced at trial. There was Felix Thaxton's phone, which was seized in Hawaii. And then there was Jamil Jones' phone that was seized outside of Jamil... But the phone number was used on Thaxton's phone as being Jones' phone number. That's correct. It matched the phone seized in California. Also, on that phone were a number of account names that said Jamil Jones or some variation thereof. There was a text message introduced at trial in which Thaxton says, can you send me your name for the cash app? And he says, Jamil, whatever his middle name is, Jones. The evidence was abundant that the phone matching the phone number that made these recorded calls was Jamil Jones' phone. So even when putting aside the voice identification, there was ample evidence linking the Jamil Jones to that phone for purposes of sufficiency of the evidence. And for that reason, you would say that the evidence that was in the father's storage space or garage as to the packaging and so on was sort of irrelevant. Well, I wouldn't say that. I think that... So first, there's two, I guess, aspects of the garage evidence. There's the evidence that was admitted at trial on the guilt issues and then at sentencing for the firearms. Well, I want to get to the firearms, but I mean as to the guilt. So it's not true that Jamil Jones had no connection to that residence. At trial was admitted business records from Southwest Airlines in which he provided the East 126th Street address as his address. So in the other business records, he provided a different address. But there was also evidence admitted at trial that the officers were following the GPS warrant on his phone. It showed him present at the East 126th Street address, including at overnight hours. And the packaging material, it would be too much of a coincidence to believe that packaging material somehow happened to also be there by somebody else. And we're talking about... But ultimately, as to sufficient evidence, you said before, and it seems to be the case, that the phone evidence was sufficient. Yeah, I agree. I agree. But it was... Right. So what about the gun? So with respect to the gun, it's not true to say that Jamil Jones had no connection to that storage area, whatever you want to call it, detached garage. Of course you did, but what was in that... It was found in a backpack in that storage area. There were all kinds of other things in there, many of which were not his. Right. So I think what... The closest parallel, I think, is the Vasquez case that Palin cited, in which the motorcycle club... There was a number of search warrants on a motorcycle club, and the firearm in question was found in a garage next to possessions that were attributed to Vasquez. Right. But here, it wasn't found. I guess that's why maybe the packaging material becomes relevant for this purpose. But nothing of substance was attributed to him in terms of possessions. Is that right? Well, I would... The packaging material is the evidence of substance that he was in that area because... Was the backpack near the packaging material? Pardon? Was the backpack near the packaging material? It was near in the sense that the area overall was small. It wasn't... I don't believe it's in the record. Or a chop of it or anything like that. I don't believe that's in the record, or at least I don't recall it at the moment. But you have not only the location, the packaging material, you have the evidence that was introduced at the sentencing hearing that the father said that's the area he uses. The father... There's no... But that... I mean, that and the packaging material both establish that at least some of the stuff there might be his, but there seems to be no debate that there was a fair amount of stuff there that wasn't his. Right? I mean, I think the testimony was piles of miscellaneous stuff from who knows. Right? So, isn't it purely speculative to think that the gun is one of the things that was his rather than one of the things that was somebody else's? I would say my response would be a couple of things. First, I think this is more akin to a case in which it's his room because that's essentially what the father told investigators, that that's the area he uses. There was no evidence in the record. That not meaning the whole storage... Some subset of the storage area? Well, I think that just to mean that for purposes of trying to figure out whether it's more on that rationale that his father's ID that was found there is his. Well, I mean, because it was his father's ID, and obviously so, I think that that changes the evaluation for that piece. But it's obviously not just the mere fact that the father's ID was found in there and that that was a space that he used doesn't make his father's ID his, so why does that make the gun his? Well, again, under the standard of more likely than not, and this court is now looking at it as an abuse of discretion whether it was an abuse of discretion for the court. Sorry, let me refrain. This court is evaluating that factual finding for clear error, the fact of the possession of the firearm. And so what I would say to that is you have the father saying that Jamil Jones used that area of the house. Let me just clarify, meaning the whole space, the whole storage area? Yes, that's correct. Not a sub area of the storage area. That's correct. You have items that we know he used recently, the packing materials within that area. And then also evidence at trial. There was testimony at the sentencing hearing mirroring the case law of this court that there's a known connection between drug traffickers and the possession of firearms. Weighing all those factors. So that's what seems to be doing all the work, because that's the only difference between that and the ID that we just happen to know is the father's and not his, is that you kind of just assume that, well, if he's drug trafficking and there's firearms found nearby that they must belong to him. And that doesn't seem to be a crazy assumption, I guess, for just a common person, but is that enough? I guess that's what this case, is that enough? Because if that's not enough, if you don't have that assumption, I don't know how you get that that gun was his. So what cases do you have that make that kind of assumption? Like the biker example you gave, is there an assumption that bikers do this? I don't believe so. I don't believe in that case that there was a mention to that. I would say it's not just, it's the judge's weighing of all of those factors. So the identification of his use of the space, the presence of materials that were clearly attributable to him, and the known association put together pushed it over 50% for the court. The known association of? Firearms and drug traffickers. Right. So the combination of those factors the judge considered to be. So if you and I were roommates, you know, and we had a shared room that we used, and there was a gun found in there, and I'm going to say you're the drug trafficker, not me, but we found out you're. I mean, I'm just not sure that like there would be any, like we could say, you know, we have no idea whose gun that is. We know that it's a shared, and that's the problem here, is that this space, it's true that the son uses it, but it appears like other people's stuff is there too, so they seem to use it. So how would we, just the fact that the only difference between us is that you're a drug trafficker too, how would we necessarily think that the firearm was yours? How would that move? I think what would be more a close example would be something like it's your house, you're letting me stay in a particular room. You may still have storage of some items in there, but I'm the one who's been using it at least recently. But that's a very poor example for you, because it was not his house. He may have been staying there sometimes, but it was clearly the father's house, and clearly this room, it wasn't that this was a distinct room that was his room. It was clearly not his room. There was all kinds of stuff in there. So your example seems to cut directly against. I think, I mean, the example, as I understand the example, it's my house, you're staying there, I got some of my stuff in there, and we find out you're a drug trafficker, and then we find a gun in that room. Explain to me why that gun is probably more likely yours than mine. And in the example, there's evidence that I've been the one using it recently, that that's what the surveillance of the GPS location data showed, and that's what the father's testimony showed. People don't typically just leave guns. I mean, old IDs you might leave laying around, and people don't usually just leave backpacks with guns, like laying around. I assume that would be part of what would cause your average person to think that these guns must belong, or not just like been misplaced or something in a storage unit. I think that's what was in the court's mind, and I don't think it's unreasonable. The court was saying this, Camille Jones was the one who was using it most recently. He definitely used it to package drugs, and the father said that's the area that he uses because I don't let him inside the house. So all those, I think, combined with common sense and the association between firearms and drug traffickers led the court to make the finding that it was more likely than not that it was his guns and apply the enhancement. Was there any attempt at fingerprinting guns for the backpack or anything in the backpack? I don't believe that it was submitted for identification, but I'm not, as I stand here today, I'm not sure, and it certainly wasn't introduced at the sentencing hearing. I'm not clear about it. I remember reading about it's not clear whose stuff. There's definitely evidence that there's father's stuff in there and there's other tenants. Specifically, is there any evidence that other tenants had stuff? I mean, is this a binary thing where either the guns would have been the father's or the son's, or is there actually evidence that other tenants were using this space? Is there any specific evidence? I don't think that there was any specific evidence of any other tenants using that space. The only evidence of any other occupants besides the father and the son was a third-party woman who was also present during the initiation of the search warrant, but I don't think that there was any substantial evidence that there was a multitude of people. Who was present in that? In the main house, not the storage area. In the storage area, I thought the evidence was that there was a multitude of stuff, some of which was other people's, not necessarily theirs. There was a multitude of stuff. I don't think there was any endeavor to identify whether it was Jamil Jones or his father's stuff. Or somebody else's. Or somebody else's. But as we spent significant time on the firearms— There was no connection of the backpack to him. No one said they saw him with a backpack or anything like that. There was no evidence of anyone else seeing him, although he did profess at length to be an avid basketball fan. Is his father a Clippers fan, or is there no evidence about that? That's not in the record. Like father, like son for basketball. But, you know, is there any other areas that the court would like me to focus on? No, I think not. So thank you. Thank you. When the government says that there was surveillance and they knew that he was there, there was no evidence of any surveillance of Mr. Jones being at the father's home. And if he goes to visit his father, that's not a crime if he's going to see his father. And maybe he was bringing his grandson. Was there evidence that he was at the home around the time of this drug transaction? There actually is no evidence. It's just Gray's saying. And there's no evidence that the father even said that he said that he wasn't allowed in the house. And he said he could use the storage room, but he didn't say he went in there, or he always used it, or he was there. There was no evidence, and there was nothing. There was no declaration that the father said that. It was all hearsay. It was what somebody else was saying. Let me ask you the question I asked. Is there evidence? I was a little unclear about whether there was actual evidence that there was anybody other than the father and the son that used that storage unit. I don't think there was any evidence that the son, that Mr. Jones, actually the son, used that storage area. It's all what. What about any, is there any evidence that any third parties used that storage area other than those two? Well, I think at one point Gray did say that other people did use that storage area, and there was evidence of all kinds of stuff in there. And on the gun case, it says that on Severus, it says, Mayor, access to weapons in a room not occupied by the defendant cannot establish possession or dominion. He didn't occupy that room. There was no evidence that he was even in there. If they had taken fingerprints off of everything, and the same thing that goes with all this packing material, there was no evidence that Mr. Jones, the defendant, used that. Like I said, there was no evidence that that machine even worked, and there was no evidence that he was even in there. There was nothing to show that he'd even been in that storage room. They're saying he could go in there. The father said he has access to it, but he didn't say he went in there or he stored things in there at all. There was no evidence of that at all. There was no evidence on the guns. The guns, in order to charge that enhancement. You're over your time, so if you want to wrap up briefly, you may. I'm saying there was no evidence. There were no fingerprints. There was no evidence against Mr. Appellant Jones that he actually sent the package, packaged the drugs, that he had drugs. And the evidence about these calls, there's really no evidence of a conspiracy either, and it's in the briefs. Thank you very much. We thank both counsel for their arguments. The case is submitted, and we will now take a five-minute recess.
judges: BERZON, MILLER, VANDYKE